UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| NICOLAS MCCARTHY, et al., | CASE NO. C23-0263JLR |
| Plaintiffs, | ORDER |
| v. | |
| AMAZON.COM, INC., | |
| Defendant. | |

## I.    INTRODUCTION

Before the court is Defendant Amazon.com, Inc.'s ("Amazon") motion to dismiss Plaintiffs Nicholas McCarthy, Martinique Maynor, Laura Jónsson, and Steinn Jónsson's (collectively, "Plaintiffs")[1] amended complaint for failure to state a claim.  (MTD (Dkt. # 47); Reply (Dkt. # 54).)  Plaintiffs oppose the motion.  (Resp. (Dkt. # 50).)  The parties

---

[1] Ms. Maynor and Mr. Jónsson bring claims individually, whereas Mr. McCarthy brings claims both individually and as a successor-in-interest to Ethan McCarthy, a deceased individual, and Ms. Jónsson brings claims both individually and as a successor-in-interest to Kristine Jónsson, a deceased individual.  (Am. Compl. (Dkt. # 15) at 1.)

1 │ also filed supplemental briefing at the direction of the court. (Pls. Supp. (Dkt. # 57); Def.

2 │ Supp. (Dkt. # 58); *see also* 5/4/23 Min. Order (Dkt. # 56).) The court has considered the

3 │ motion, all materials submitted in support of and in opposition to the motion, and the

4 │ governing law. Being fully advised,[2] the court GRANTS Amazon's motion to dismiss

5 │ and DISMISSES Plaintiffs' amended complaint.

6 │                              **II.   BACKGROUND**

7 │         Below, the court discusses the relevant factual and procedural background.

8 │ **A.   Factual Background**

9 │         This case arises from the death by suicide of two teenagers, Ethan McCarthy and

10 │ Kristine Jónsson, caused by intentionally ingesting sodium nitrite manufactured and sold

11 │ by a third party on Amazon's website. (*See generally* Am. Compl. (Dkt. # 15).) Sodium

12 │ nitrite is a "water soluble . . . yellowish crystalline powder." (*Id.* ¶ 130.) It is used

13 │ "mainly as a corrosion inhibitor . . . , an antidote to cyanide poisoning, and as a

14 │ microbial." (*Id.* ¶ 131.) At a diluted level, sodium nitrite can be found in food

15 │ preservatives. (*Id.* ¶ 135.) Where sodium nitrite exceeds 95% purity, it is considered a

16 │ "reagent chemical," and a trace amount can "make a person extremely ill." (*Id.*

17 │ ¶¶ 135-36.) "When sodium nitrite is used for suicide, it is mixed with a glass of water

18 │ and consumed orally"; "[o]ne gulp" is, according to Plaintiffs, enough to kill an

19 │ individual. (*Id.* ¶ 132.)

20 │

21 │         ────────────────
        [2] Plaintiffs and Amazon both request oral argument. (MTD at 1; Resp. at 1.) The court,
22 │ however, concludes that oral argument would not be helpful to its disposition of the motion. *See*
Local Rules W.D. Wash. LCR 7(b)(4).

The sodium nitrite at issue in this case was sold by Loudwolf, Inc. ("Loudwolf"), a third-party seller of industrial chemicals on Amazon.  (*Id.* ¶¶ 90, 96.)  Loudwolf sold the sodium nitrite under its own brand name on Amazon.com at 99.6% purity, rendering it a reagent grade chemical.  (*Id.* ¶¶ 95, 97 (alleging that sodium nitrite has "no non-institutional or household use" at this purity level).)  The Loudwolf Sodium Nitrite (the "Sodium Nitrite") sold on Amazon.com was labeled as being "suitable for most experimental and analytical applications, as well as many technical and household purposes."  (*Id.* ¶ 98.)  However, the label also directed users to "do [their] own research regarding its application to [their] specific purpose."  (*Id.* (including the words "INDUSTRIAL & SCIENTIFIC" on the top of the bottle).)  The label warns that the Sodium Nitrite is a "high purity, reagent grade chemical" and is toxic.  (*Id.* ¶ 98.)  It also includes the warning:  "HAZARD Oxidizer.  Irritant."  (*Id.* ¶ 99.)  The label did not, as Plaintiffs claim, warn users of "how deadly the product is or how to reverse the effects." (*Id.*; *see also id.* ¶ 101 (alleging that "[n]either the product label nor the Amazon product page for Loudwolf Sodium Nitrite mentioned a proven antidote to suicide attempts via [s]odium [n]itrite").)

According to Plaintiffs, in recent years, sodium nitrite has "become a highly recommended suicide method on the pro-suicide website Sanctioned Suicide."  (*Id.* ¶¶ 139-40 ("Sanctioned Suicide specifically recommends [s]odium [n]itrite as an effective method of completing a suicide that is cheap and easy and . . . difficult for family members and professionals to stop.").)  Sanctioned Suicide and its users allegedly recommend that individuals purchase sodium nitrite from Amazon.com and Loudwolf.

1  (*Id.* ¶¶ 141-42, 116.)  Sanction Suicide's website also "provides threads of instructions

2  specifying dosages and methods of dissolving the substance in water prior to

3  consumption" and "recommends supplementing the [s]odium [n]itrite with antacid

4  medication like Tagamet to ensure the poison can be digested without vomiting." (*Id.*

5  ¶ 143.)

6    Plaintiffs allege that Amazon has "received dozens of notices that its various

7  brands of [s]odium [n]itrite were being used for suicide, dating back to at least 2018."

8  (*Id.* ¶¶ 102, 110, 115, 11.)  Despite these notices, Amazon allegedly continued to sell

9  sodium nitrite on its website, according to Plaintiffs, until December 2022.  (*Id.* ¶¶ 100,

10  102, 121; *see also id.* ¶ 8 (noting that Amazon disabled sales of sodium nitrite to

11  individuals in December 2022).)  Additionally, Plaintiffs allege that when Amazon

12  encountered one-star reviews for sodium nitrite "relating to the deadliness of the product

13  and its use for suicide," Amazon removed the reviews containing the word suicide,

14  stating that such reviews violated its community guidelines, and banned those individuals

15  from leaving future reviews.  (*Id.* ¶¶ 122, 144-45.)

16    On September 9, 2020, Kristine Jónsson, a 16-year-old living in Ohio, registered

17  for an account on Sanctioned Suicide.  (*Id.* ¶¶ 157, 161; *see also id.* ¶¶ 160-72 (alleging

18  that Kristine became "resolute about dying" during the COVID-19 pandemic).)  She took

19  notes regarding "the four steps to death by [s]odium [n]itrite" and "calculated that for her

20  body size, she would need 20 grams of [s]odium [n]itrite and 200 mg of Tagamet so she

21  would not throw up." (*Id.* ¶¶ 171-72.)  On September 24, 2020, Kristine purchased

22  Loudwolf Sodium Nitrite on Amazon.com using her personal account.  (*Id.* ¶ 173; *see*

*also id.* ¶ 179 (noting that Kristine purchased Tagamet from a CVS pharmacy, rather than Amazon.com).)  The product arrived at her home two days later.  (*Id.* ¶¶ 174-75.)  On September 30, 2020, police found Kristine dead in a parked vehicle near her home.  (*Id.* ¶¶ 180-85.)  The police found a bottle of Sodium Nitrite in the car with Kristine, and Kristine's mother, Ms. Jónsson, found a "pile of letters" in Kristine's room that "looked like suicide notes."  (*Id.* ¶¶ 183-85.)  According to the Coroner's Report, Kristine's cause of death was "Sodium Nitrite Toxicity," and the manner of death was "Suicide."  (*Id.* ¶ 186.)

On January 1, 2021, Ethan McCarthy, a 17-year-old living in West Virginia, placed an order for Loudwolf Sodium Nitrite on Amazon.com using his mother's account.  (*Id.* ¶¶ 187-88, 22, 26.)  Ethan's mother, Ms. Maynor, received an email confirmation from Amazon that the Sodium Nitrite would arrive between January 13 and January 15, 2021.  (*Id.* ¶ 190.)  After asking her children if anyone had ordered the product, and being told they had not, she contacted Amazon and requested they cancel the order, at which point Amazon told her it was canceling the order and informing the manufacturer.  (*Id.* ¶¶ 190-91.)  Although Ms. Maynor believed the order was canceled, the Sodium Nitrite arrived at their home several days later.  (*Id.* ¶¶ 193-95 (stating that Ms. Maynor noticed that some Amazon packages had arrived and brought them inside, assuming they contained items from her other recent Amazon purchases).)  On January 7, 2021, Ms. Maynor found Ethan dead in his bed.  (*Id.* ¶¶ 196-99, 201.)  When first responders arrived, Ms. Maynor noticed a bottle labeled Sodium Nitrite and a glass with white dried powder and a spoon on his desk.  (*Id.* ¶¶ 196-200 (stating that the Sodium

1  Nitrite "was the same item for which she had received the Amazon receipt, the purchase

2  that Amazon assured her was canceled").)  Ethan's "cause of death was ruled a suicide,

3  by ingestion of Sodium Nitrite."  (*Id.* ¶ 201 ("Per the Death Certificate, Ethan's cause of

4  death was 'Sodium Nitrite Intoxication.'")*see also id.* ¶ 202 (stating that Ms. Maynor

5  found a deleted folder on Ethan's computer labeled "my hopes and dreams.").)

6  **B.    Procedural Background**

7          Plaintiffs filed their original complaint against Amazon and Loudwolf in

8  California state court, and Amazon removed the case to the Northern District of

9  California.  (*See generally* NOR (Dkt. # 1-1).)  The first amended complaint alleges the

10 following claims against Loudwolf and Amazon:  negligent and strict product liability

11 claims (Am. Compl. ¶¶ 34-36, 232-43 (Count I)); common law negligence claims (*id.*

12 ¶¶ 244-47 (Count II)); and a negligent infliction of emotional distress ("NIED") claim

13 brought solely by Ms. Maynor (*id.* ¶¶ 248-51 (Count III)).

14         Amazon subsequently moved to dismiss or transfer the case, arguing that the

15 California district court lacked personal jurisdiction over it and that Plaintiffs failed to

16 state a claim under California, Ohio, or West Virginia law.  (*See* MTD/MTT (Dkt. # 25)

17 at 12-28.)  The court concluded that it lacked personal jurisdiction over Amazon and

18 transferred the case to the Western District of Washington.  (2/17/23 Min. Entry (Dkt.

19 # 34) at 1-2.)  The court also granted Plaintiffs' request to dismiss Loudwolf from the

20 case.  (*See id.* at 2.)  Thereafter, Amazon filed the instant motion to dismiss.  (MTD.)

21 //

22 //

ORDER - 6

1

### III.   ANALYSIS

2      The court sets forth the relevant standard of review before turning to address

3 choice-of-law issues and Amazon's motion to dismiss.

4 **A.      Standard of Review**

5      Federal Rule of Civil Procedure 12(b)(6) provides for dismissal when a complaint

6 "fail[s] to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).

7 Under this standard, dismissal is appropriate if the complaint fails to state a cognizable

8 legal theory, *Shroyer v. New Cingular Wireless Servs., Inc.*, 622 F.3d 1035, 1041 (9th

9 Cir. 2010), or fails to provide "sufficient factual matter, accepted as true, to 'state a claim

10 to relief that is plausible on its face,'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)

11 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "A claim has facial

12 plausibility when the plaintiff pleads factual content that allows the court to draw the

13 reasonable inference that the defendant is liable for the misconduct alleged."  *Iqbal*, 556

14 U.S. at 678; *see also Somers v. Apple, Inc.*, 729 F.3d 953, 965 (9th Cir. 2013) (stating that

15 the allegations must "rise beyond mere conceivability or possibility" to meet the

16 plausibility standard).  The court construes the complaint in the light most favorable to

17 the nonmoving party, *Livid Holdings Ltd. v. Salomon Smith Barney, Inc.*, 416 F.3d 940,

18 946 (9th Cir. 2005), and is not required to accept as true legal conclusions or "formulaic

19 recitation[s] of the legal elements of a cause of action," *Chavez v. United States*, 683 F.3d

20 1102, 1008 (9th Cir. 2012).

21 //

22 //

1  **B.      Choice of Law**

2          As an initial matter, the court must determine the state law applicable to Plaintiffs'

3  claims.  This court, sitting in diversity, applies the choice-of-law rules of Washington.

4  *See Downing v. Abercrombie & Fitch*, 265 F.3d 994, 1005 (9th Cir. 2001).  Under

5  Washington law, when parties dispute choice of law, there must be an actual conflict

6  between the laws or interests of Washington and the laws or interests of another state

7  before the court will engage in a conflict-of-laws analysis.  *Erwin v. Cotter Health Ctrs.*,

8  167 P.3d 1112, 1120 (Wash. 2007).  An "actual conflict" exists where the result of a

9  particular issue would be different under the law of the two states.  *Id.* (citing *Seizer v.*

10  *Sessions*, 940 P.2d 261, 264 (Wash. 1997)).  Absent an actual conflict, Washington law

11  applies.  *Id.*; *Burnside v. Simpson Paper Co.*, 864 P.2d 937, 942 (Wash. 1994) (affirming

12  application of Washington law where defendant failed to show conflict between

13  Washington and California law).

14          Amazon evaluates Plaintiffs' claims under Washington, Ohio, and West Virginia

15  law, and argues, "a conflict does not exist, and cannot be identified, unless this [c]ourt

16  adopts one of Plaintiffs' novel theories for expanding Washington tort law."  (Reply at

17  11; *see also* MTD at 18-25 (laying out the applicable law in Ohio and West Virginia "in

18  the event of a conflict" or "if [t]here [w]ere a [c]onflict").)  Plaintiffs argue that

19  Washington law should apply because there is no "actual conflict" between the laws of

20  Washington and the laws of Ohio and West Virginia.  (Resp. at 11-12 (contending that

21  Amazon failed to identify any real conflict of law).)

22  *//*

1   Here, the court need not conduct a choice-of-law analysis because Plaintiffs' novel

2   legal theories are not cognizable under Washington law or otherwise.  Accordingly, there

3   is no "actual conflict" between Ohio and West Virginia law and Washington law, and the

4   court applies Washington law to Plaintiffs' claims.  *See, e.g.*, *DP Aviation v. Smiths*

5   *Indus. Aerospace & Def. Sys. Ltd.*, 268 F.3d 829, 845 (9th Cir. 2001) (applying

6   Washington law where no conflict was shown); *Erwin*, 167 P.3d at 1120 (explaining that

7   there is only an actual conflict if Washington law compels a different result than the law

8   of the other state).

9   Applying Washington law, Plaintiffs allege three causes of action:  (1) product

10  liability under the Washington Product Liability Act ("WPLA"), RCW 7.72.010, *et seq.*;

11  (2) common law negligence; and (3) common law NIED.  (Am. Compl. ¶¶ 232-51.)  The

12  court will address each in turn.

13  **C.    Product Liability Claims**

14  The WPLA, which is the exclusive remedy for product liability claims in

15  Washington, "creates a single cause of action for product-related harm with specified

16  statutory requirements for proof."  *Kirkland v. Emhart Glass S.A.*, 805 F. Supp. 2d 1072,

17  1076 (W.D. Wash. 2011); *see also Wash. State Physicians Ins. Exch. & Ass'n v. Fisons*

18  *Corp.*, 858 P.2d 1054, 1066 (Wash. 1993).  The WPLA distinguishes between and

19  imposes different standards of liability on (1) manufacturers and (2) product sellers for

20  harm caused by defective products.  *See* RCW 7.72.030-.040.  Manufacturers are strictly

21  liable for products that are not reasonably safe due to the design, to inadequate warnings,

22  //

1    to a manufacturing defect, or to failure to conform to express or implied warranties.[3]

2    RCW 7.72.030; *see also Macias v. Saberhagen Holdings, Inc.*, 282 P.3d 1069, 1074

3    (Wash. 2012) (clarifying that strict liability, not negligence, principles apply to product

4    liability claims against manufacturers under the WPLA).  In contrast, absent certain

5    circumstances,[4] product sellers are liable under the WPLA only if the plaintiff's harm

6    was proximately caused by the (1) negligence of the product seller, (2) the breach of

7    an express warranty made by the product seller, or (3) the intentional misrepresentation

8    of facts or intentional concealment of information by the product seller.  RCW

9    7.72.040(1).

10          The parties do not dispute, and the court agrees, that Amazon is not a

11   manufacturer of Sodium Nitrite for purposes of the WPLA.  (*See* Am. Compl. ¶¶ 233-34

12   (alleging that only Loudwolf is a seller and manufacturer of the Sodium Nitrite); MTD at

13   5-6; Reply at 2; Resp. at 18 (implying that Amazon is not a manufacturer of Sodium

14   Nitrite by conceding that strict product liability for the Sodium Nitrite is not at issue

15   here)); *see also* RCW 7.72.010(2) (defining "manufacturer").  As such, to the extent

16   Count I alleges strict product liability claims against Amazon based on its sales of

17   Sodium Nitrite, such claims fail.  *See Macias*, 282 P.3d at 1074; RCW 7.72.030.

18

19          _____

20          [3] Manufacturers are not strictly liable, however, for post-manufacture failure to warn
     claims.  RCW 7.72.030(1)(c).

21          [4] RCW 7.72.040(2) lists the circumstances under which a product seller may also be held
     liable as a manufacturer.  The parties appear to agree that no such circumstances apply in this
     case.  (*See* MTD at 5-6 (arguing why such circumstances do not apply); Reply at 2; *see generally*
22   Resp. (declining to address the issue).)

1    Accordingly, the court must determine whether Plaintiffs have plausibly alleged a

2   claim for seller liability under the WPLA.  Assuming that Amazon meets the WPLA's

3   definition of a product seller,[5] RCW 7.72.010(1), Amazon can only be held liable as a

4   seller of Sodium Nitrite under on one of the three above-mentioned theories of liability.

5   *See* RCW 7.72.040(1).  Plaintiffs appear to allege product liability claims against

6   Amazon under two of those theories:  (1) Amazon's negligence proximately caused

7   Ethan and Kristine's deaths, and (2) Amazon's intentional concealment of information

8   about the Sodium Nitrite proximately caused Ethan and Kristine's deaths.  (*See* Am.

9   Compl. ¶ 241; MTD at 10-13, 16-17 (characterizing Plaintiffs' amended complaint as

10   stating claims based on these two theories); Resp. at 17-20 (not disputing this

11   characterization).)  The court addresses each theory below.

12   1.  Seller Liability Under the WPLA Based on Negligent Conduct

13    To state a claim for negligence under the WPLA, a plaintiff must establish duty,

14   breach, causation, and damages.  *Huntington v. Smoke City for Less LLC*, No.

15   4:22-CV-05014-MKD, 2023 WL 2031423, at *3-4 (E.D. Wash. Jan. 11, 2023); *Pereira v.*

16   *Cocoa Invs., Inc.*, No. 56024–7–I, 2005 WL 3032900, at *2 (Wash. Ct. App. Nov. 14,

17   2005) (unpublished).  Amazon contends, and Plaintiffs do not dispute, that a plaintiff

18   must show that the injury-causing product was defective before a seller can be held liable

19

20    [5] For the purposes of the instant motion, Amazon does not dispute Plaintiffs' assertion
that Amazon meets the WPLA's definition of a product seller.  (*See* Am. Compl. ¶ 233 (alleging
21   that Amazon is a product seller); Resp. at 17 (treating Amazon as a product seller); MTD at 11
n.2 ("While Amazon's position is that it is not a 'seller' under the WPLA in cases involving
22   third-party sellers' products, it does not raise the issue at the Rule 12(b)(6) stage.").)
Accordingly, the court treats Amazon as a seller for the purpose of the instant motion.

1    for negligence under the WPLA.  (*See* MTD at 11-13 (providing judicial and legislative

2    support for this position); Reply at 2-3 (restating the same); Resp. at 17 (failing to dispute

3    this point and arguing that the amended complaint establishes that the Sodium Nitrite was

4    defective).)  In light of the case law and legislative history cited by Amazon,[6] and

5    Plaintiffs' failure to dispute the issue,[7] the court agrees that the "text, history, and

6    purpose" of the WPLA establishes that a seller cannot be liable in negligence unless the

7    product at issue was defective.

8         Under the WPLA, a product is defective if it is not reasonably safe in design,

9    manufacture, or warnings.  *See* RCW 7.72.010, *et seq.*; *Anderson v. Dreis & Krump Mfg.*

10   *Corp.*, 739 P.2d 1177, 1182 (Wash. Ct. App. 1987) (noting that in the failure to warn

11   context, a product may be found defective, "though faultlessly designed and

12   manufactured," if it is not reasonably safe to the user due to a lack of adequate warnings);

13   (*see also* Resp. at 6 n.1).  Plaintiffs allege that Amazon was negligent under RCW

14

15        [6] *See, e.g.*, *Knott v. Liberty Jewelry & Loan, Inc.*, 748 P.2d 661, 664-65 (Wash. Ct. App.
16   1988) (discussing such a limitation in case involving negligent and strict product liability); RCW
     7.72.020(1) (stating that "[t]he previously existing applicable law of this state on product liability
17   is modified only to the extent set forth in"); S. Journal, 47th Leg., Reg. Sess. 625 (Wash. 1981)
     (intending RCW 7.72.040 to provide the same "protection afforded to the non-manufacturing
18   product seller in Section 105 of the" Model Uniform Product Liability Act ("UPLA")); Model
     Uniform Product Liability Act, 44 Fed. Reg. 62,714, 62,726-27 (Oct. 31, 1979) (clarifying that
19   sellers' negligence-based liability is limited to:  (1) "such product seller's own conduct with
     respect to the design, construction, inspection, or condition of the product"; and (2) "any failure
20   of such product seller to transmit adequate warnings or instructions about the danger or proper
     use of the product").

21        [7] *See, e.g.*, *Citizens for Free Speech, LLC v. Cnty. of Alameda*, 338 F. Supp. 3d 995, 1005
     (N.D. Cal. 2018) ("By failing to respond to the County's contention, Plaintiffs have effectively
22   conceded its validity."), *aff'd*, 953 F.3d 655 (9th Cir. 2020); Local Rules W.D. Wash. LCR
     7(b)(2).

1  7.72.040(1)(a) because:  (1) the Sodium Nitrite was defective due to inadequate warnings

2  regarding, for example, how deadly the product is; (2) Amazon owed a duty to exercise

3  reasonable care to warn of known hazards and not sell defective products; (3) Amazon

4  breached this duty by selling Sodium Nitrite to Kristine and Ethan when Amazon knew it

5  would likely be used for suicide; and (4) Amazon's breach was the proximate cause of

6  Kristine and Ethan's deaths.[8]  (*See* Resp. at 17-20; *see also* Am. Compl. ¶¶ 99, 241(e)-(f)

7  (alleging that the warnings should have also described "the painful death Sodium Nitrite

8  causes," provided more "information on how to counteract Sodium Nitrite's poisonous

9  affects [sic]," and "indicate[d] antidotes").)  Amazon argues that it cannot be liable for

10  negligence under RCW 7.72.040(1)(a) because:  (1) the danger of ingesting Sodium

11  Nitrite was known or obvious and the product's warnings were adequate; (2) Amazon

12  had no duty to provide additional warnings; and (3) in any event, Amazon's alleged

13  negligent failure to warn did not proximately cause Kristine and Ethan's deaths.  (*See*

14  MTD at 7-11, 13; Reply at 2-5.)

15      Plaintiffs' WPLA negligent product liability claim fails for a number of reasons.

16  First, the court concludes that the Sodium Nitrite was not defective, and that Amazon

17  thus did not owe a duty to warn.  Under Washington law, "no warning need be given

18

19      [8] Although the amended complaint lists Sodium Nitrite as the only defective product at issue in this case (*see* Am. Compl. ¶¶ 233-43), in opposing Amazon's motion to dismiss,

20  Plaintiffs also assert that "Amazon.com itself is [a] defective" product (Resp. at 18).  However, Plaintiffs cannot oppose dismissal by presenting and relying on allegations that are not in their

21  amended complaint. *See, e.g.*, *Evalobo v. Aldridge Pite, LLP*, No. 216CV00539APGVCF, 2016 WL 7379021, at *5 n.3 (D. Nev. Dec. 20, 2016).  Additionally, the court agrees with Amazon's

22  contention that Amazon.com, which is a website, "is not a 'product' because it is not a tangible 'object' that is 'capable of delivery.'"  (Reply at 2 (quoting RCW 7.72.010(3)).)

1    where the danger is obvious or known to the operator." *Dreis*, 739 P.2d at 1182 (noting

2    that this is true under negligence and strict liability theories); *Anderson v. Weslo, Inc.*,

3    906 P.2d 336, 340-42 (Wash. Ct. App. 1995) (noting that the risk of falling and getting

4    hurt while jumping on a trampoline is obvious and a manufacturer/seller need not warn of

5    such obvious dangers); *Mele v. Turner*, 720 P.2d 787, 789-90 (Wash. 1986) (finding

6    neighbors were not required to warn teenager regarding lawnmower's dangers—e.g.,

7    putting hands under running lawnmower—where the allegedly dangerous condition was

8    obvious and known to plaintiff).[9]  In line with this principle, Washington courts

9    consistently hold that a warning label need not warn of "every possible injury."

10   *Anderson*, 906 P.2d 341-42; *Baughn v. Honda Motor Co.*, 727 P.2d 655, 661-64 (Wash.

11   1986) (finding sufficient Honda's warning that bikes were intended for "off-the-road use

12   only" and that riders should wear helmets; no warning required as to risk of getting hit by

13   car, the precise danger eventually encountered); *Novak v. Piggly Wiggly Puget Sound

14   Co.*, 591 P.2d 791, 795-96 (Wash. Ct. App. 1979) (finding general warnings about

15   ricochet sufficient to inform child that a BB gun, if fired at a person, could injure an eye).

16       Here, the Sodium Nitrite's warnings were sufficient because the label identified

17   the product's general dangers and uses, and the dangers of ingesting Sodium Nitrite were

18   both known and obvious.  The allegations in the amended complaint establish that

19   Kristine and Ethan deliberately sought out Sodium Nitrite for its fatal properties,

20

21       [9] *See also, e.g.*, *Duncan v. Kelsey Hayes, Inc.*, 855 F.2d 861 (9th Cir. 1988) (concluding
     that the "obvious or known" common law exception to negligent and strict product liability in
22   the failure to warn context appears to still be in force after the passage of the WPLA).

1  intentionally mixed large doses of it with water, and swallowed it to commit suicide.

2  (*See, e.g.*, Am. Compl. ¶¶ 161-72, 178-79, 183, 185-86, 190-202, 20-23, 116, 139-43.)

3  Kristine and Ethan's fates were undisputedly tragic, but the court can only conclude that

4  they necessarily knew the dangers of bodily injury and death associated with ingesting

5  Sodium Nitrite.  *See Webstad v. Stortini*, 924 P.2d 940, 945 (Wash. Ct. App. 1996)

6  (noting that under Washington law, suicide is "a voluntary willful choice" by a person

7  who "knows the purpose and the physical effect of the suicidal act").  Additionally, the

8  risk associated with intentionally ingesting a large dose of an industrial grade chemical is

9  also obvious.  *See, e.g.*, *Greene v. A.P. Prods., Ltd.*, 717 N.W.2d 855, 861-62 (Mich.

10  2006) (holding that the risk of ingesting hair oil was "obvious" where its label listed

11  "ingredients . . . which would be unfamiliar to the average product user"); *Miles v. S.C.*

12  *Johnson & Son, Inc.*, No. 00 C 3278, 2002 WL 1303131, at *4-5 (N.D. Ill. June 12, 2002)

13  ("The dangers of ingesting Drano are obvious to the ordinary consumer, who presumably

14  purchases the product with knowledge of—and in fact because of—its caustic

15  properties.").  In this case, the danger was particularly obvious because the Sodium

16  Nitrite "was not marketed as safe for human consumption or ingestion," *Greene*, 717

17  N.W.2d at 861, and appears to have been categorized as "Business, Industrial, and

18  Scientific Supplies" (Am. Compl. ¶¶ 73, 77).  The Sodium Nitrite bottle also bears the

19  words "INDUSTRIAL & SCIENTIFIC" on the front.  (*See id.* at ¶ 98 (stating on label

20  that Sodium Nitrite has numerous known uses and directing users to first do their own

21  research regarding Sodium Nitrite's "application to [their] specific purpose").)  Further,

22  //

ORDER - 15

1   the label on the Sodium Nitrite warns that the product is a toxic, reagent grade chemical

2   and also states:  "HAZARD Oxidizer.  Irritant."  (*Id.* ¶¶ 98-99.)

3         Plaintiffs do not allege any facts that contradict the clear implications that Ethan

4   and Kristine were well aware of the dangers of ingesting Sodium Nitrite and intentionally

5   purchased the chemical because of those known and obvious dangers.  (*See, e.g.*, *id.*

6   ¶¶ 161-72, 178-79, 183, 185-86, 190-202, 20-23, 116, 139-43; *see generally* Resp. at

7   17-18.)  Nor do they present any case law that would hold Amazon liable for negligent

8   product liability under these circumstances.[10]  (*See* Resp.)  Accordingly, given Kristine

9   and Ethan's knowledge regarding the dangers of ingesting Sodium Nitrite as well as the

10  general warnings provided on the bottle and the obvious dangers associated with

11  ingesting industrial-grade chemicals, the court concludes that the Sodium Nitrite's

12  warnings were not defective.  Amazon therefore had no duty to provide additional

13  warnings regarding the dangers of ingesting Sodium Nitrite.[11]  *See, e.g.*, *Dreis*, 739 P.2d

14  at 1182 ("The warning's contents, combined with the obviousness of the press'

15  dangerous characteristics, indicate that any reasonable operator would have recognized

16  the consequences of placing one's hands in the point-of-operation area.").

17

18        [10] The fact that Amazon allegedly continued to sell the Sodium Nitrite to "children" after
    it "knew [the Sodium Nitrite] was used for suicide" does not change this conclusion.  (Resp. at

19  18.)  "[L]iability is not imposed simply because a product causes harm," even with "products
    used by children."  *Baughn*, 727 P.2d at 660-67; *Knott*, 748 P.2d at 664-65.

20
          [11] In reaching this conclusion, the court rejects Plaintiffs' assertion that whether "the
21  warnings were adequate or the risks obvious and known . . . are issues of fact and not law."
    (Resp. at 18.)  Plaintiff provides no authority to support this position.  (*Id.*)  Regardless, the court

22  concludes that the factual allegations in the complaint, accepted as true, establish that the
    warnings were adequate for the reasons articulated above.

1    Second, Plaintiffs' WPLA negligent product liability claim also fails because,

2    even if Amazon owed a duty to provide additional warnings as to the dangers of ingesting

3    sodium nitrite, its failure to do so was not the proximate cause of Kristine and Ethan's

4    deaths. "Proximate cause is an essential element" of both negligence and strict liability

5    theories.[12] *Baughn*, 727 P.2d at 664. "If an event would have occurred regardless of a

6    defendant's conduct, that conduct is not the proximate cause of the plaintiff's injury."

7    *Davis v. Globe Mach. Mfg. Co.*, 684 P.2d 692, 696 (Wash. 1984). Under Washington

8    law, if the product's user knows there is a risk, but chooses to act without regard to it, the

9    warning "serves no purpose in preventing the harm." *Lunt*, 814 P.2d at 1194 (concluding

10   that defendants alleged failure to warn plaintiff of specific dangers associated with skiing

11   and bindings was not proximate cause of injuries because plaintiff would have kept

12   skiing regardless); *Baughn*, 727 P.2d at 664-65 (concluding that allegedly inadequate

13   warnings were not proximate cause of harm where victim knew the risk and ignored the

14   warnings; the harm would have occurred even with more vivid warnings of risk of death

15   or serious injury). A product user's "deliberate disregard" for a product's warnings is a

16   "superseding cause that breaks the chain of proximate causation." *Beard v. Mighty Lift,*

17   *Inc.*, 224 F. Supp. 3d 1131, 1138 (W.D. Wash. 2016) (stating that "a seller may

18   reasonably assume that the user of its product will read and heed the warnings . . . on the

19   product" (citing *Baughn*, 727 P.2d at 661)).

20

---

21    [12] "Proximate cause can be resolved as a matter of law when no reasonable persons
      would differ." *Lunt v. Mount Spokane Skiing Corp.*, 814 P.2d 1189, 1194 (Wash. Ct. App. 1991)
22    (collecting cases).

Here, the court concludes that additional warnings would not have prevented Kristine and Ethan's deaths.  The allegations in the amended complaint establish that Kristine and Ethan sought the Sodium Nitrite out for the purpose of committing suicide and intentionally subjected themselves to the Sodium Nitrite's obvious and known dangerous and those described in the warnings on the label.  (*See, e.g.*, Am. Compl. ¶¶ 161-72, 178-79, 183, 185-86, 190-202, 20-23, 116, 139-43.)  Plaintiffs do not plausibly allege that better warnings from Amazon would have discouraged Ethan and Kristine from ingesting sodium nitrite.  (*See generally id.*; Resp.)  Accordingly, Plaintiffs have failed to plausibly allege that Amazon's failure to provide additional warnings about the dangers of ingesting Sodium Nitrite proximately caused Kristine and Ethan's deaths.[13]  *See, e.g.*, *Anderson*, 906 P.2d at 341-42 (finding no proximate cause, concluding that "it is unlikely that [plaintiff] would have changed his behavior in response to even more detailed warnings" because plaintiff "was aware of the risks of injury, yet paid so little attention to the warnings that were given").

In sum, Plaintiffs have failed to establish that the Sodium Nitrite was defective, that Amazon had a duty to provide additional warnings regarding the dangers of ingesting Sodium Nitrite, or that Amazon's alleged failure to provide such additional warnings was

---

[13] Plaintiffs' arguments to the contrary are unavailing.  (Resp. at 19-20.)  First, Plaintiffs provide no authority to support their contention that expert testimony is required to establish proximate causation.  To the contrary, numerous courts have dealt with the issue of proximate causation in product liability cases without relying on expert testimony.  *See, e.g.*, *Lunt*, 814 P.2d at 1194; *Anderson*, 906 P.2d at 341-42; *Pardo v. Olson & Sons, Inc.*, 106 F.3d 408 (Table), 1996 WL 772631, at *1-2 (9th Cir. 1996).  Second, the cases Plaintiffs cite to regarding foreseeability and superseding causes are inapposite because they do not address the test for foreseeability with respect to failure to warn claims and a plaintiff's refusal to heed warnings.  (*Compare* Resp. at 19-20, *with* Reply at 5); *see Beard*, 224 F. Supp. 3d at 1137-38.

1    the proximate cause of Ethan and Kristine's deaths.  As such, the allegations in Count I

2    fail to state a plausible claim for negligent product liability under RCW 7.72.040(1)(a).

3         2.  Seller Liability Under the WPLA Based on Intentional Concealment

4         Within their product liability cause of action (Count I), Plaintiffs allege that

5    Amazon intentionally concealed "information" about the Sodium Nitrite by "remov[ing]

6    and conceal[ing] negative product reviews that warned consumers of the product[']s use

7    for death by suicide."  (Am. Compl. ¶ 241(j); *see id.* ¶¶ 122, 145-47 (alleging that

8    Amazon removed a review in which a parent stated that their son bought Sodium Nitrite

9    to commit suicide because "the review violated its community guidelines" and suspended

10   account's ability to "contribute reviews and other content on Amazon").)  The court

11   construes this allegation as a claim for product seller liability under the WPLA based on

12   intentional concealment.  *See* RCW 7.72.040(1)(c); (*see also* MTD at 16 (characterizing

13   it as the same); Resp. at 27-29 (not disputing this characterization)).  To prevail on this

14   claim, Plaintiffs must establish that Ethan and Kristine's deaths were "proximately

15   caused" by Amazon's "intentional concealment of information about the [Sodium

16   Nitrite]."  RCW 7.72.040(1)(c).

17        Amazon argues that Plaintiffs' WPLA intentional concealment claim fails

18   because, among other things, it is barred by the Communications Decency Act ("CDA"),

19   47 U.S.C. § 230.  (*See* Reply at 9; MTD at 16-17 (contending the claim also fails because

20   Plaintiffs do not identify any facts about the product that Amazon intentionally concealed

21   and do not plausibly allege intent to induce suicide or that Amazon's "intentional

22   concealment" of reviews "proximately caused" Ethan and Kristine's deaths).)  In

1   response, Plaintiffs do not discuss whether the CDA bars this specific claim; instead, they

2   mischaracterize Amazon's CDA immunity argument as seeking complete immunity from

3   all of Plaintiffs' claims and argue against such broad immunity.  (Resp. at 27-29.)  In its

4   reply brief, Amazon clarifies that it only seeks CDA immunity for the claim of

5   intentional concealment under the WPLA based on its handling of product reviews.

6   (Reply at 9.)

7           "Section 230 of the CDA immunizes providers of interactive computer services

8   against liability arising from content created by third parties." *Fair Hous. Council of San*

9   *Fernando Valley v. Roommates.com, LLC*, 521 F.3d 1157, 1162 (9th Cir. 2008).  Section

10   230(c)(1) provides that "[n]o provider or user of an interactive computer service shall be

11   treated as the publisher or speaker of any information provided by another information

12   content provider."  47 U.S.C. § 230(c)(1).  Additionally, Section 230(e)(3) provides that

13   "[n]o cause of action may be brought and no liability may be imposed under any State or

14   local law that is inconsistent with this section."  *Id.* § 230(e)(3).  In the Ninth Circuit,

15   immunity applies under Section 230(c)(1) if three criteria are met:  (1) "the provider is an

16   interactive computer service"; (2) "the plaintiff is treating the entity as the publisher or

17   speaker"; and (3) "the information is provided by another information content provider."

18   *Rigsby v. GoDaddy Inc.*, 59 F.4th 998, 1007 (9th Cir. 2023) (citing *Dyroff v. Ultimate*

19   *Software Grp., Inc.*, 934 F.3d 1093, 1097 (9th Cir. 2019)).

20           The court finds that all three criteria for Section 230(c)(1) immunity are met with

21   respect to Plaintiffs' intentional concealment claim under the WPLA.  First, under

22   Section 230, "[t]he term 'interactive computer service' means any information service,

1   system, or access software provider that provides or enables computer access by multiple

2   users to a computer server." 47 U.S.C. § 230(f)(2). Amazon asserts, and Plaintiffs do not

3   contest, that Amazon is a provider of interactive computer services within the meaning of

4   Section 230. (*See generally* MTD at 16; Resp. at 27-29.) The court agrees. *See, e.g.*,

5   *Joseph* v. *Amazon.com, Inc.*, 46 F. Supp. 3d 1095, 1105 (W.D. Wash. 2014) (holding that

6   Amazon is an interactive service provider because Amazon "operates a website that

7   allows consumers to purchase items online"); *Roommates*, 521 F.3d at 1162 n.6 ("[T]he

8   most common interactive computer services are websites.").

9          Second, the court concludes that Plaintiffs' WPLA intentional concealment claim

10   "inherently requires the court to treat the defendant as the 'publisher or speaker' of

11   content provided by another." *Barnes v. Yahoo!, Inc.*, 570 F.3d 1096, 1102 (9th Cir.), *as*

12   *amended* (Sept. 28, 2009). "[P]ublication involves reviewing, editing, and deciding

13   whether to publish or to withdraw from publication third-party content." *Id.* at 1102-03

14   (noting that defendant cannot be held liable for decision whether to publish or remove

15   third-party content). In other words, "[p]ublishing encompasses 'any activity that can be

16   boiled down to deciding whether to exclude material that third parties seek to post

17   online.'" *Gonzalez v. Google LLC*, 2 F.4th 871, 894 (9th Cir. 2021) (quoting

18   *Roommates*, 521 F.3d at 1170-71), *rev'd on other grounds by Twitter, Inc., v. Taamneh*,

19   __ U.S. __, 143 S. Ct. 1206 (2023). If "the duty that the plaintiff alleges the defendant

20   violated derives from the defendant's status or conduct as a 'publisher or speaker,'"

21   Section 230(c)(1) "precludes liability." *Barnes*, 570 F.3d at 1102. The court agrees with

22   Amazon's contention that Plaintiffs' WPLA intentional concealment claim seeks to treat

1    Amazon as a publisher by imputing liability for Amazon's decision to exclude certain

2    reviews posted by third parties from publication on its website.  *See, e.g.*, *Rangel v.*

3    *Dorsey*, No. 21-CV-08062-CRB, 2022 WL 2820107, at *2 (N.D. Cal. July 19, 2022)

4    ("Rangel seeks to 'treat [Twitter] as the publisher' because his claims derive entirely

5    from Twitter's decision to exclude his content and suspend his account—that is,

6    traditional publishing functions."); *Riggs v. MySpace, Inc.*, 444 F. App'x 986, 987 (9th

7    Cir. 2011) (affirming dismissal of claims involving "MySpace's decisions to delete

8    Riggs's user profiles on its social networking website yet not delete other profiles Riggs

9    alleged were created by celebrity imposters").

10         Third, the court concludes that Plaintiffs' WPLA intentional concealment claim is

11    based on "information provided by another information content provider," rather than

12    information provided by Amazon.  *Barnes*, 570 F.3d at 1102.  Section 230(c)(1) "cuts off

13    liability only when a plaintiff's claim faults the defendant for information provided by

14    third parties."  *Lemmon v. Snap, Inc.*, 995 F.3d 1085, 1093 (9th Cir. 2021).  Thus,

15    "internet companies remain on the hook when they create or develop" the content at issue

16    or are "'responsible . . . in part, for the creation or the development of' the offending

17    content."  *Id.* (quoting *Roommates*, 521 F.3d at 1162); *see also Kimzey v. Yelp! Inc.*, 836

18    F.3d 1263, 1269 & n.4 (9th Cir. 2016) (asking whether a defendant "ma[de] a material

19    contribution to the creation or development of [the] content").

20         Here, the "information" at issue in Plaintiffs' WPLA intentional concealment

21    claim is the "negative product reviews that warned consumers of [Sodium Nitrite's] use

22    for death by suicide."  (Am. Compl. ¶ 241(j).)  This "information" was, as Plaintiffs

admit, provided by the users of Amazon.com.  (*See id.* ¶¶ 122, 144-45.)  Indeed, the

amended complaint does not allege that Amazon provided, created, or developed any

portion of the negative product reviews.  (*See generally id.*)  Accordingly, only the users

of Amazon.com, not Amazon, acted as information content providers with respect to

Plaintiffs' WPLA intentional concealment claim.  *See, e.g.*, *Fed. Agency of News LLC v.*

*Facebook, Inc.*, 432 F. Supp. 3d 1107, 1117-19 (N.D. Cal. 2020) (concluding that

Facebook was not an information content provider where plaintiffs sought to hold

Facebook liable for removing a plaintiff's Facebook account, posts, and content); *Joseph*,

46 F. Supp. 3d at 1106-07 (concluding that Amazon was not acting as an information

content provider where plaintiff's claims arose from the allegedly defamatory statements

in reviews posted by third parties).

Accordingly, construing the facts in Plaintiffs' favor, the court concludes that the

allegations in Count I of the amended complaint fail to state a claim for intentional

concealment claim under the WPLA based on Amazon's removal of customer reviews

because the CDA bars such a claim.  *See, e.g.*, *Levitt v. Yelp! Inc.*, No. C-10-1321 EMC,

2011 WL 5079526, at *6 (N.D. Cal. Oct. 26, 2011) ("Plaintiffs' allegations of extortion

based on Yelp's alleged manipulation of their review pages—by removing certain

reviews and publishing others or changing their order of appearance—falls within the

conduct immunized by § 230(c)(1)."), *aff'd*, 765 F.3d 1123 (9th Cir. 2014).[14]

---

[14] Because Amazon does not seek CDA immunity with respect to the rest of Plaintiffs'
claims (Reply at 9), the court does not address Plaintiffs' arguments as to why Amazon is not
entitled to CDA immunity with respect to their negligent product liability and common law

**D.      Common Law Negligence and NIED Claims**

In Count II of the amended complaint, Plaintiffs allege common law negligence claims against Amazon based on the following theories of liability:  (1) breach of duty "[t]o not assist or aid in a suicide attempt" and (2) breach of duty "[t]o not supply a substance for the use of another whom it knew or had reason to know to be likely to use it in a manner involving unreasonable risk of physical harm to himself."  (Am. Compl. ¶ 245(b)-(c); *see also id.* ¶¶ 246-47 (alleging that Amazon's breach of such duties caused Kristine and Ethan's deaths).)  In Count III of the amended complaint, Ms. Maynor brings a common law NIED claim against Amazon, alleging that Amazon breached the above-listed duties, as well as a duty to warn, and that Amazon's negligence caused Ms. Maynor to suffer severe emotional distress.  (*Id.* ¶¶ 249-61.)

Amazon argues that Plaintiffs' common law negligence and NIED claims must be dismissed because (1) they are preempted by the WPLA and (2) they fail to state a plausible claim for relief.  (*See* MTD at 10-11, 13-16; Reply at 2-9; Def. Supp. at 1-6.) The court first addresses whether Plaintiffs' common law negligence-based claims (Counts II and III) are preempted by the WPLA.  The court then considers whether the allegations in Counts II and III are sufficient to state plausible claims for relief under the WPLA's negligent product liability cause of action, RCW 7.72.040(1)(a).

//

//

---

negligence claims.  (*See, e.g.*, Resp. at 27-29 (collecting cases and contending that these claims do not seek to hold Amazon liable as a publisher or for content provided by others).)

1          1.  Preemption

2          When enacted in 1981, the WPLA "created a single cause of action for

3   product-related harms."  *Fisons*, 858 P.2d at 1067 (stating that the WPLA replaced

4   "previously existing common law remedies, including common law actions for

5   negligence").  The WPLA is "the exclusive remedy for product liability claims" as it

6   "supplants all common law claims or actions based on harm caused by a product."

7   *Macias*, 282 P.3d at 1073-74; *Am. Fam. Mut. Ins. Co. v. Wood Stoves Etc., Inc.*, 518 P.3d

8   666, 668 (Wash. Ct. App. 2022) (stating that the WPLA "preempts common law

9   liability" for product-related harms).  The WPLA defines a "product liability claim," in

10  relevant part, to include "any claim or action brought for harm caused by the

11  manufacture, . . . warnings, instructions, marketing, packaging, . . . or labeling of the

12  relevant product."  RCW 7.72.010(4).  The WPLA's statutory product liability cause of

13  action preempts or subsumes all product-related common law claims "based on any

14  substantive legal theory except fraud, intentionally caused harm," or claims under

15  Washington's "[C]onsumer [P]rotection [A]ct."  RCW 7.72.010(4) (noting that the

16  phrase "product liability claim" includes claims previously based on negligence, strict

17  liability, and breach of a duty to warn, among other things); *Wash. Water Power Co. v.

18  Graybar Elec. Co.*, 774 P.2d 1199, 1204 (Wash.) ("The scope of the statute could not

19  have been stated more broadly."), *amended sub nom. Wash. Power Co. v. Graybar Elec.

20  Co.*, 779 P.2d 697 (Wash. 1989).  Because the WPLA allows a plaintiff to sue a product

21  seller for product-related harms under a negligence theory, RCW 7.72.040(1)(a), when a

22  plaintiff attempts to sue a seller for product-related harms under common law negligence,

1   the WPLA preempts or subsumes such claims by requiring the claims to be analyzed

2   under the WPLA.[15]  *See, e.g.*, *Huntington*, 2023 WL 2031423, at *4 (declining to find

3   common law negligent product liability claim against seller barred by WPLA and

4   construing the claim as a negligence claim under the WPLA).

5        The court begins by addressing whether Plaintiffs' common law negligence claims

6   (Count II) are preempted or subsumed by the WPLA.  Plaintiffs argue such claims are not

7   subsumed under the WPLA because they are not "product-based" and do not concern any

8   of the things listed in the WPLA's definition of a "product liability claim."  (Resp. at

9   25-26 (claiming that such claims have "nothing to do with failing to warn of specific

10   Sodium Nitrite dangers or how Amazon marketed the product").)  Rather, Plaintiffs

11   contend that their claims relate to "Amazon's platform itself and how the services

12   uniquely offered by Amazon to Loudwolf, Ethan, and Kristine to get the suicide chemical

13   into the hands of these teenagers."  (*Id.*)

14        The court disagrees with this portrayal and concludes that the common law

15   negligence claims in Count II fall within the WPLA's preemptive scope.  As noted above,

16   the WPLA defines a "product liability claim," in relevant part, to include "any claim or

17   _____

18        [15] Amazon is incorrect to the extent it implies that the WPLA's preemption bars any
     common law negligence-based claims against product sellers.  (*See generally* MTD at 10-11;
19   Reply at 6-7; Def. Supp.)  Preemption works differently with respect to common law negligence
     claims for product-related harms asserted against a product manufacturer.  Because the WPLA
20   only allows plaintiffs to sue product manufacturers under strict liability theories, RCW 7.72.030;
     *Macias*, 282 P.3d at 1074, except in the case of a post-manufacture failure to warn, a plaintiff is
21   barred from asserting a negligence claim for product-related harms against a product
     manufacturer under both common law and the WPLA.  *See, e.g.*, *Mar. v. Ethicon, Inc.*, No. C20-
22   5032BHS, 2021 WL 719261, at *3 (W.D. Wash. Feb. 24, 2021) (dismissing with prejudice
     plaintiff's common law negligence-based claims against manufacturer as preempted by the
     WPLA).

1    action brought for harm caused by the . . . marketing . . . of the relevant product."  RCW

2    7.72.010(4).  The WPLA does not, however, define "marketing."  When a statute does

3    not define a term, courts "typically 'give the phrase its ordinary meaning.'"  *Animal*

4    *Legal Def. Fund v. U.S. Dep't of Agric.*, 933 F.3d 1088, 1093 (9th Cir. 2019) (quoting

5    *FCC v. AT & T Inc.*, 562 U.S. 397, 403 (2011)); *Garrison v. Wash. State Nursing Bd.*,

6    550 P.2d 7, 8 (Wash. 1976) ("Words in a statute should be given their ordinary meaning

7    absent ambiguity and/or a statutory definition.").  The court may look to a word's

8    dictionary definition to determine its ordinary meaning.  *See LaCoursiere v. Camwest*

9    *Dev., Inc.*, 339 P.3d 963, 967 (Wash. 2014) ("To give undefined terms meaning, this

10   court may look to dictionary definitions and related statutes."); *Transwestern Pipeline*

11   *Co., LLC v. 17.19 Acres of Prop. Located in Maricopa Cnty.*, 627 F.3d 1268, 1270 (9th

12   Cir. 2010) (stating that courts can consult dictionary definitions to determine ordinary

13   meaning of undefined words).  Black's Law Dictionary defines "marketing" as "[t]he act

14   or process of promoting and selling, leasing, or licensing products."  *Marketing*, Black's

15   Law Dictionary (11th ed. 2019); *see also Marketing*, Merriam-Webster,

16   https://www.merriam-webster.com/dictionary/marketing (last visited June 23, 2023)

17   (defining marketing as "the act or process of selling or purchasing in a market" or "the

18   process or technique of promoting, selling, and distributing a product or service").

19   Plaintiffs fail to identify anything indicating that the legislature intended the word

20   "marketing" to mean something different than its ordinary meaning under the WPLA.

21   (*See generally* Resp.)

22

Because Plaintiffs seek to hold Amazon liable for its role in facilitating the sale of

Sodium Nitrite to Kristine and Ethan through Amazon.com, the court concludes that

Amazon's conduct falls squarely within the ordinary meaning of "marketing."  (*See, e.g.*,

Am. Compl. ¶¶ 1, 7-14, 18-28, 99-102, 121-22, 125-26, 205, 211-14, 221-23, 226-27,

241, 245-46); *Marketing*, Black's Law Dictionary, *supra*; *Marketing*, Merriam-Webster,

*supra*.  Moreover, Plaintiffs' allegations that Kristine and Ethan's deaths were caused by

ingesting the Sodium Nitrite involve "product-related" harms.  (*See, e.g.*, Am. Compl.

¶¶ 173-74, 183-86, 190, 198-201, 243, 247; *see also id.* ¶¶ 228-31 (describing harm

Plaintiffs suffered as a result of experiencing Kristine and Ethan's deaths)); *see Fisons*,

858 P.2d at 1067.  Because Plaintiffs' common law negligence claims are

negligence-based claims for "harm caused by the . . . marketing" of the Sodium Nitrite,

RCW 7.72.010(4), they fall within the WPLA's preemptive scope.[16]

Plaintiffs contend that Ms. Maynor's NIED claim, in which she seeks to hold

Amazon liable for the emotional distress she suffered from experiencing Ethan's death, is

not preempted or subsumed by the WPLA.  (*See, e.g.*, Pls. Supp.; Am. Compl. ¶¶ 22-24,

---

[16] In reaching this conclusion, the court also rejects Plaintiffs' mistaken reliance on *Louisiana-Pacific Corp. v. ASARCO, Inc.*, 24 F.3d 1565 (9th Cir. 1994).  (*See* Resp. at 26-27.)  The *ASARCO* court held that an "intentional nuisance claim" falls under the WPLA's exclusion for "claims based on 'intentionally caused harm.'"  *ASARCO*, 24 F.3d at 1584 (quoting RCW 7.72.010(4)).  *ASARCO* is inapposite because the plaintiff there alleged an intentional tort.  *See id.*; RCW 7.72.010(4) (carving out exception for claims based on a substantive legal theory of "intentionally caused harm"); S. Journal, 47th Leg., Reg. Sess. 635 (Wash. 1981) (noting that the WPLA's "intentionally caused harm" exception applies only to "intentional tort[s],").  Here, Plaintiffs' causes of action are negligence-based (*see generally* Am. Compl.), and therefore preempted by the WPLA irrespective of Amazon's knowledge.  *See, e.g.*, *City of Seattle v. Monsanto Co.*, 237 F. Supp. 3d 1096, 1102-03 (W.D. Wash. 2017) (rejecting a similar argument).

26, 190-204, 230, 241, 243, 245, 247, 248-51, 258.)  Plaintiffs so argue because "no court

to consider bystander NIED claims in a product liability action has found the claims to be

preempted or subsumed by the WPLA."  (Pls. Supp. at 3.)  However, the authorities

Plaintiffs cite are unavailing because the cases either did not have occasion to address

preemption, an affirmative defense, or relied on other cases that did not address

preemption.  *See, e.g.*, *Colbert v. Moomba Sports, Inc.*, 176 P.3d 497 (Wash. 2008) (not

addressing preemption); *Percival v. General Electric Co.*, 708 F. Supp. 2d 1171 (W.D.

Wash. 2010) (same); *Davis v. Edgewell Pers. Care Brands, LLC*, No.

2:18-CV-00057-SAB, 2018 WL 1975685 (E.D. Wash. Apr. 26, 2018) (relying on

*Colbert*).  Accordingly, Plaintiffs' proffered authorities fail to support their argument that

Ms. Maynor's NIED claim is not preempted or subsumed by the WPLA.

   The court concludes that Ms. Maynor's NIED claim (Count III) falls within the

WPLA's preemptive scope.  First, Ms. Maynor's NIED claim targets the same

"marketing" conduct by Amazon as Plaintiffs' common law negligence claim and is thus

a negligence-based "product liability claim."  (*See, e.g.*, *supra*; Am. Compl. ¶¶ 22-24, 26,

190-204, 230, 241, 243, 245, 247, 248-51, 258); RCW 7.72.010(4); *see also Snyder v.

Med. Serv. Corp. of E. Wash.*, 35 P.3d 1158, 1164 (Wash. 2001) (noting that NIED

claims "sound[] in negligence").  Second, Ms. Maynor is a "claimant" under the WPLA's

broad definition, although she did not purchase the Sodium Nitrite.  *See* RCW

7.72.010(5) (defining "claimant" as "any person . . . that suffers harm," and conferring

standing to sue "even though the claimant did not buy the product from, or enter into any

contractual relationship with, the product seller"); (*see also* Def. Supp. at 2).  Finally, Ms.

1  Ms. Maynor's alleged emotional distress "damages, if proved, are recoverable under the

2  WPLA." *See Bylsma v. Burger King Corp.*, 293 P.3d 1168, 1171 (Wash. 2013)

3  (concluding that emotional distress damages in the absence of physical injury, if proved,

4  meet the WPLA's broad definition of "harm").  That is because the WPLA broadly

5  defines "harm" as "any damages recognized by the courts of [Washington]" except for

6  "direct or consequential economic loss," RCW 7.72.010(6), and Washington courts have

7  recognized that, under certain conditions, bystanders can recover damages for emotional

8  distress caused by experiencing "the negligent bodily injury of a family member."

9  *Colbert*, 176 P.3d at 500-07 (quoting *Gain v. Carroll Mill Co.*, 787 P.2d 553, 557 (Wash.

10  1990)) (discussing some of the limitations on bystander NIED claims).  For these

11  reasons, Ms. Maynor's NIED claim is also preempted or subsumed by the WPLA.  *See*

12  *Graybar*, 774 P.2d at 1203 (noting that the WPLA's broad definition of a product liability

13  claim "counsels in favor of preemption, not against it").

14        In sum, the common law negligence and NIED claims alleged in Counts II and III

15  of Plaintiffs' amended complaint are preempted or subsumed by the WPLA.  Because the

16  WPLA provides a cause of action against sellers for negligent product liability, the court

17  will construe Plaintiffs' common law negligence-based claims as negligent product

18  liability claims under RCW 7.72.040(1)(a) and will evaluate whether the allegations in

19  Counts II and III state plausible claims for relief under RCW 7.72.040(1)(a).

20  //

21  //

22  //

1

2   2.   Whether the Allegations in Counts II and III State Plausible Claims for Relief
        Under RCW 7.72.040(1)(a)

3       The allegations in Count II (common law negligence) fail to state a plausible claim

4   for relief under RCW 7.72.040(1)(a).  As discussed above, a plaintiff must establish that

5   the injury-causing product is defective in order to recover against a negligent product

6   seller under the WPLA.  (*See supra* § III.C.1.)  The court has already rejected Plaintiffs'

7   argument that the Sodium Nitrite was defective on the basis of inadequate warnings.  (*See

8   id*.)  Accordingly, the allegations in Count II fail to state plausible negligent product

9   liability claims under the WPLA because, as a threshold point, the Sodium Nitrite is not

10  defective.  Because Plaintiffs fail to meet this threshold requirement, the court need not

11  address their remaining arguments or the other elements of this claim.

12      Ms. Maynor also fails to allege a plausible claim for NIED (Count III) under the

13  WPLA because she cannot establish, as a threshold point, a predicate claim of negligence

14  against Amazon under the WPLA.  "Bystander negligent infliction of emotional distress

15  claims involve emotional trauma resulting from one person's observation or discovery of

16  another's *negligently* inflicted physical injury."  *Hegel v. McMahon*, 960 P.2d 424, 426

17  (Wash. 1998) (emphasis added).  "The bystander theory of recovery is a collateral claim

18  for damages suffered indirectly as the result of the defendant's breach of a duty owed to

19  the decedent."[17]  *Est. of Lee ex rel. Lee v. City of Spokane*, 2 P.3d 979, 990 (Wash. Ct.

20  _____

21      [17] Plaintiffs failed to offer any meaningful response to Amazon's argument that Ms.
    Maynor's NIED claim fails because it is collateral to Plaintiffs' failed negligence claims.
    (*Compare* MTD at 25, *and* Reply at 9-10, *with* Resp. at 24 (claiming only that even if the NIED

22  claim is collateral of Plaintiffs' negligence claims, the NIED claim survives because Plaintiffs
    sufficiently alleged that Amazon negligently caused Ethan's death).)

1   App. 2000) ("To recover under the bystander theory, the Lees would have to establish

2   that the defendants breached a duty owed to Mr. Lee.").  Because the allegations in

3   Counts I and II fail to state plausible negligence claims against Amazon under the

4   WPLA, Ms. Maynor's bystander NIED claim under the WPLA, which is premised on

5   Amazon's alleged negligence as a seller of Sodium Nitrite, also fails.  *See id.*

6   Accordingly, the allegations in Counts II and III fail to state a plausible claim for relief

7   under RCW 7.72.040(1)(a).

8        In sum, the court GRANTS Amazon's motion to dismiss Plaintiffs' amended

9   complaint for failure to state a plausible claim for relief against Amazon.[18]  (*See supra*

10  § III.C n.6 (strict product liability allegations in Count I fail); *id.* § III.C.1 (negligent

11  product liability allegations in Count I fail); *id.* § III.C.2 (intentional concealment

12  allegation in Count I fails); *id.* § III.D.1-.2 (common law negligence and NIED

13  allegations in Counts II and III fail).)

14  //

15  //

16

17       [18] In opposing Amazon's motion to dismiss, Plaintiffs wrongly urge the court to rely on
    two unreasoned, unpublished King County Superior Court orders denying Amazon's motions to
18  dismiss in *Scott v. Amazon.com, Inc.*, No. 22-2-01739-2 SEA (K.C. Sup. Ct.) and *Viglis v.
    Amazon.com, Inc.*, No. 23-2-05719-8 SEA (K.C. Sup. Ct.).  (*See* Resp. at 6, 16-17; Yackulic
19  (Dkt. # 52); Not. of Supp. Authority (Dkt. # 59).)  Those orders have no impact on the court's
    conclusion or analysis.  The Ninth Circuit instructs federal courts to "attach no weight to
20  unreasoned conclusions in unpublished state decisions" when resolving questions of state law.
    *Flowers v. Carville*, 310 F.3d 1118, 1125 (9th Cir. 2002).  "The unreported decision of a state
21  trial court" is not binding and may be relied on only "to the extent its reasoning is persuasive."
    *Spinner Corp. v. Princeville Dev. Corp.*, 849 F.2d 388, 390 n.2 (9th Cir. 1988).  Thus, these
22  unpublished state court decisions that "fail to offer any reasoning" have no persuasive weight
    here.  *Flowers*, 310 F.3d at 1125.

1    **E.    Leave to Amend**

2        On a Rule 12(b)(6) motion, "a district court should grant leave to amend even if no

3    request to amend the pleading was made, unless it determines that the pleading could not

4    possibly be cured by the allegation of other facts." *Cook, Perkiss & Liehe v. N. Cal.*

5    *Collection Serv.*, 911 F.2d 242, 247 (9th Cir. 1990); *see DeSoto v. Yellow Freight Sys.,*

6    *Inc.*, 957 F.2d 655, 658 (9th Cir. 1992) ("A district court does not err in denying leave to

7    amend where the amendment would be futile.").  The court's discretion to grant leave to

8    amend is particularly broad where the plaintiff has previously filed an amended

9    complaint. *Sisseton-Wahpeton Sioux Tribe v. United States*, 90 F.3d 351, 355 (9th Cir.

10   1996); *Turner v. Cnty. of Los Angeles*, 18 F. App'x 592, 597 (9th Cir. 2001) (concluding

11   that the court did not abuse its discretion in denying the second amended complaint with

12   prejudice and without leave to amend where the court had already allowed the plaintiff to

13   amend their complaint); *Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1052 (9th Cir. 2008)

14   ("Appellants fail to state what additional facts they would plead if given leave to

15   amend . . . . Accordingly, amendment would be futile.").

16       Here, Plaintiffs have not asked for leave to amend, nor have they stated what

17   additional facts they would plead if given leave to amend.  (*See generally* Resp.)  The

18   court concludes that granting leave to amend would be futile because it is clear from the

19   amended complaint that all of Plaintiffs' claims are premised on allegations that Kristine

20   and Ethan's deaths were caused by ingesting the Sodium Nitrite and seek to hold Amazon

21   liable for negligently "marketing" the Sodium Nitrite.  (*See generally* Am. Compl.; *supra*

22   §§ III.C.1-.2, D.1-.2; *id.* § III.D.1 (defining marketing under the WPLA).)  Such

1   negligence-based product liability claims must be pled under the WPLA, which imposes

2   liability on product sellers in limited circumstances.  (*See supra* § III.D.1; *id.* § III.C);

3   RCW 7.72.040(1).  However, Plaintiffs cannot possibly make out a plausible negligence

4   claim against Amazon under the WPLA given the court's conclusions that (1) Amazon,

5   as a product seller, can only be held liable for negligence under the WPLA if the Sodium

6   Nitrite was defective, (2) that the Sodium Nitrite was not defective with respect to its

7   warnings, and (3) Kristine and Ethan intentionally misused the Sodium Nitrite to commit

8   suicide.  (*See supra* § III.C.1, D.2.)  Additionally, Plaintiffs' intentional concealment

9   claim under the WPLA, which is premised on Amazon's removal of product reviews, is

10  barred by the CDA.  (*See supra* § III.C.2.)  Accordingly, the court concludes that the

11  amended complaint's deficiencies cannot be cured by the allegation of other facts and

12  DENIES leave to amend.  *See Cook*, 911 F.2d at 247.

13                          **IV.    CONCLUSION**

14          For the foregoing reasons, the court GRANTS Amazon's motion to dismiss (Dkt.

15  # 47) and DISMISSES Plaintiffs' amended complaint with prejudice and without leave to

16  amend.

17          Dated this 27th day of June, 2023.

18

19  _____

20  JAMES L. ROBART
    United States District Judge

21

22